UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

ALLIANCE COLLECTION AGENCIES, INC. and HEALTHCARE BUSINESS SERVICES, INC.

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

Case No. 3:26-cv-1009

Hon.

D. Andrew Portinga (P55804)
Bryce C. Akins (P88780)
Amanda L. Rauh-Bieri (P83615)
MILLER JOHNSON
Attorneys for Plaintiffs
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
portingaa@millerjohnson.com
akinsb@millerjohnson.com
rauhbieria@millerjohnson.com

## **Complaint**

Alliance Collection Agencies, Inc. ("Alliance") and Healthcare Business Services, Inc. ("HBS") (collectively, "Plaintiffs") state the following Complaint against the United States of America ("Defendant"):

## Overview

1. This is a suit for a tax refund. Plaintiffs are entitled to, but did not receive, refunds due to employee retention tax credits. Alliance is entitled to such credits and refunds for the first, second and third quarters of 2021, and HBS is entitled to such credits and refunds for the third quarter of 2021.

## The Parties, Jurisdiction, and Venue

2. Alliance is a third-party debt collection agency with its principal place of business in Marshfield, Wisconsin.

3. HBS is a first-party revenue cycle management company with its principal place of business in Marshfield, Wisconsin.

4. Plaintiffs specialize in revenue cycle management and in recovery of past-due accounts for healthcare providers (e.g., hospitals, physicians, and medical systems).

5. This Court has jurisdiction over this matter because these claims are against the United States of America and brought under federal law. This Court specifically has jurisdiction pursuant to 28 U.S.C. §§ 1331 (civil action arising under the Constitution, laws, or treaties of the United States), 1340 (civil action arising under Act of Congress providing for internal revenue), and 1346(a)(1) (civil action against United States for recovery of tax or other sum wrongfully collected under internal revenue laws); and 26 U.S.C. § 7422 (civil action for refund).

6. Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. §§ 1391 and 1402(a), as each of the Plaintiffs is a for-profit corporation with its principal place of business in Marshfield, Wisconsin, within this District.

7. Plaintiffs have satisfied all administrative and jurisdictional requirements for filing this lawsuit.

8. Alliance timely filed a claim for refund (Form 941-X) for the first quarter of 2021.

9. Alliance timely filed a claim for refund (Form 941-X) for the second quarter of 2021.

10. Alliance timely filed a claim for refund (Form 941-X) for the third quarter of 2021.

11. HBS timely filed a claim for refund (Form 941-X) for the third quarter of 2021.

12. In a Letter 105C dated August 19, 2024, Defendant disallowed Alliance's claim for refund for the first quarter of 2021.

13. In a Letter 105C dated April 10, 2026, Defendant disallowed Alliance's claim for refund for the second quarter of 2021.

14. In a Letter 105C dated October 17, 2024, but which IRS transcripts indicate was not mailed until October 28, 2024, Defendant disallowed Alliance's claim for refund for the third quarter of 2021.

15. In a Letter 105C dated December 10, 2024, Defendant disallowed HBS's claim for refund for the third quarter of 2021.

16. Pursuant to Internal Revenue Code (IRC) Section 6532(a)(1), a suit for refund must be filed within two years of the date a claim for refund is disallowed, unless the parties agree to an extension of that limitations period.

17. This suit is within two years of the date the Internal Revenue Service ("IRS") disallowed Plaintiffs' claims for refund for the second quarter of 2021 and the third quarter of 2021.

18. Defendant and Alliance signed Form 907 (Exhibit 1) in which they stipulated to the extension of the time for filing a suit for refund for the first quarter of 2021 until August 19, 2027.

19. This suit is, therefore, timely with respect to all of the Plaintiffs' claims for refund for all of the stated quarters.

20. Alliance timely requested an Appeals Conference with respect to the IRS's disallowances of Alliance's claims for refunds for the first quarter of 2021, the second quarter of 2021, and the third quarter of 2021.

21. HBS timely requested an Appeals Conference with respect to the IRS's disallowance of HBS's claim for refund for the third quarter of 2021.

22. The IRS, however, granted an Appeals Conference only to Alliance and only for the first quarter of 2021, and recently stated that it could not locate Alliance's requests for an Appeals Conference for the second quarter of 2021 or the third quarter of 2021.

23. With respect to the second quarter of 2021 and the third quarter of 2021, the IRS's failure to grant Alliance or HBS an Appeals Conference and the IRS's loss of Alliance's requests for Appeals Conferences have forced Plaintiffs to commence this action.

24. Defendant can be served through the United States Attorney for the Western District of Wisconsin.

**<u>The Employee Retention Credit</u>**

25. The Employee Retention Credit ("ERC") was enacted under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), to encourage businesses to retain employees during the economic disruptions caused by the COVID-19 pandemic.

26. The ERC was subsequently amended, extended, and modified for the periods in question (among others) by Sections 206 and 207 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260), and Section 9651 of the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2 (codified at I.R.C. § 3134).

27. For the first, second and third quarters of 2021, an employer is entitled to a refundable tax credit (against the employer's share of Medicare or Social Security taxes) equal to 70 percent of qualified wages paid to each employee, up to a maximum credit of $7,000 per employee per quarter.

28. Under I.R.C. § 3134, an employer qualifies for the ERC in 2021 if it carried on a trade or business during the calendar quarter and satisfied one of two tests (which are described below): (i) the "Gross Receipts Test" or (ii) the "Suspension Test."

29. For each of the periods in question, an employer satisfied the Gross Receipts Test if the employer experienced a significant decline in gross receipts, defined as gross receipts for the calendar quarter that were less than 80 percent of

the gross receipts for the same calendar quarter in calendar year 2019 (or met the alternative safe harbor look-back quarter election).

30. For each of the periods in question, an employer satisfied the Suspension Test if the employer's trade or business operations were fully or partially suspended due to applicable government orders, related to COVID-19, that limited commerce, travel, or group meetings.

31. A reduction in gross receipts for 2021 due to COVID-19 orders was relevant to both the Gross Receipts Test and the Suspension Test.

**Factual Background**

32. For purposes of the Gross Receipts Test for the periods in question, Alliance and HBS were aggregated entities because of common ownership. That is, the Gross Receipts Test was to be applied based on their combined gross receipts.

33. Alliance and HBS's combined gross receipts were down for the quarters in question (when compared to the corresponding quarters in 2019) as follows:

| Quarter in 2021 | Percentage Reduction |
|---|---|
| 1st Quarter | 21.21% |
| 2nd Quarter | 27.39% |
| 3rd Quarter | 29.77% |

34. Thus, Alliance and HBS satisfied the primary Gross Receipts Test for the first, second and third quarters of 2021.

35. For the first and second quarters of 2021, the IRS agreed with and allowed HBS's ERC claims for refund, which were based solely on Alliance and HBS satisfying the Gross Receipts Test on an aggregated basis.

36. The Gross Receipts Test for Alliance and HBS for the first and second quarters of 2021 was the same test. That is, if HBS satisfied it, Alliance satisfied it.

37. There is an alternative Gross Receipts Test. In IRS Notices 2021-23 and 2021-49, which are binding on the IRS (but not on Plaintiffs), the IRS provided for an alternative test, the "Alternative Quarter Election Test," pursuant to which an employer could satisfy the Gross Receipts Test by comparing the quarter prior to the quarter in question to the corresponding 2019 quarter. For example, with respect to the first quarter of 2021, Plaintiffs would be allowed to elect to compare their fourth quarter of 2020 receipts to their gross receipts for the fourth quarter of 2019.

38. Alliance and HBS, on an aggregated basis, satisfied the Alternative Quarter Election Test for the first quarter of 2021 (a 29.2% reduction in gross receipts), the second quarter of 2021 (a 21.21% reduction in gross receipts), and the third quarter of 2021 (a 27.39% reduction in gross receipts).

***Effect of Reduction in Gross Receipts on the Suspension Test***

39. For the periods in question, a reduction in gross receipts may also be relevant to the determination of whether an employer satisfied the Suspension Test.

40. In IRS Notice 2021-20, which is binding on the IRS (but not on Plaintiffs), the IRS stated that a suspension of operations (a "Suspension") under the Suspension Test must have had more than a nominal effect on the employer's business overall, or on a significant activity of the employer.

41. In Notice 2021-20 (which is binding on the IRS but not on Plaintiffs), the IRS conceded that a 10% reduction in an employer's overall gross receipts or gross

receipts from a significant activity, if due to a governmental order, was more than a nominal effect for Suspension Test purposes.

42. Each of Alliance and HBS suffered, overall, more than a 10% reduction in gross receipts due to governmental orders and, therefore, satisfied the IRS Suspension Test requirement that governmental orders have more than a nominal effect.

43. Additionally, in Notice 2021-20, the IRS conceded that if one member of an aggregated group suffered a full or partial Suspension, all members of the aggregated group are deemed to have suffered a Suspension.

44. Each of Alliance and HBS suffered a full or partial Suspension.

45. Alliance derives gross receipts from fees it receives for collecting consumer medical debt for services provided by its healthcare clients. Alliance's core business before, during and after COVID was and is the collection of medical debt placed with Alliance for collection.

46. Alliance's core business was significantly harmed during COVID. Alliance's fees from this business were down during the quarters in question by far more than the percentage required to satisfy the IRS's more-than-nominal-effect threshold.

47. Pre-COVID, Alliance also earned substantial revenue from managing collection litigation matters. During 2020 and 2021, Alliance was forced to entirely shut down that portion of its business, which resulted in a 100% reduction in gross receipts from that business for the periods in question.

48. Those numbers satisfy the IRS requirement of the Suspension Test that the government orders must have had more than a nominal effect.

***The Applicable Orders***

49. As stated previously, Plaintiffs were aggregated for ERC purposes and, therefore, a Suspension suffered by either Plaintiff is deemed to have been suffered by both Plaintiffs.

50. Plaintiffs work closely with their healthcare business partners.

51. Plaintiffs' businesses are essentially tied to the businesses of their healthcare business partners.

52. For that reason, COVID-related governmental orders that affected Plaintiffs' business partners affected Plaintiffs.

53. Although headquartered in Wisconsin, Plaintiffs do business in all 50 states.

54. For that reason, governmental orders from Wisconsin and other states affected Plaintiffs.

55. During the first three quarters of 2021, Plaintiffs' business operations were subject to a continuing series of federal, state and local COVID-19 public-health and workplace-safety orders issued by multiple agencies (the "Government Orders").

56. The Government Orders imposed limitations on Plaintiffs' operations and those of their business partners through multiple mechanisms, including: (i) requirements that caused Plaintiffs to send employees home; (ii) mandatory workplace-safety protocols that reduced capacity and operational efficiency; (iii) mass

employee absenteeism that was essentially authorized by law; and (iv) mandatory cancellation or severe limitation of in-person and patient meetings (which reduced business and revenue).

57. Wisconsin businesses, and businesses in other states in which Plaintiffs operated, were also investigated and fined for violations of OSHA rules and the OSHA General Duty Clause.

58. The IRS has acknowledged that state government enforcement of OSHA guidelines or rules can rise to the level of an applicable order for purposes of the Suspension Test. ***See*** IRS Office of Chief Counsel, General Legal Advice Memorandum 2023-007.

59. A non-exhaustive list of Wisconsin and federal COVID-era statutes and orders that combined to cause operational Suspensions for Plaintiffs is below:

| **Jurisdiction** | **Order Citation** | **Summary** |
|---|---|---|
| State of Wisconsin | Executive Order #72 – Declaring a Public Health Emergency (March 12, 2020); expired May 11, 2020 (60-day statutory limit under Wis. Stat. § 323.10) | Declared the initial statewide public health emergency and designated DHS as lead agency, triggering emergency powers and enabling all subsequent emergency orders. |
| State of Wisconsin (DHS) | Emergency Order #12 – Safer at Home Order (March 24, 2020; effective March 25, 2020); superseded by Emergency Order #28 on April 24, 2020 | Required all individuals to stay at home except for enumerated essential activities; ordered all non-essential businesses to cease operations; and imposed Social Distancing Requirements on all essential businesses. Enforceable by up to 30 days' imprisonment or a $250 fine.<br><br>Caused structural operational changes, including transition to remote work, cessation of in-person client services, and |

| | | |
|---|---|---|
| | | modification of business workflows from which Plaintiffs have not fully recovered. |
| State of Wisconsin | Executive Order #82 – Declaring a Public Health Emergency (July 30, 2020) | Required all individuals age 5 and older to wear face coverings in all indoor public spaces and enclosed spaces open to the public when another person outside the individual's household was present. Enforceable by civil forfeiture of up to $200 under Wis. Stat. § 323.28. |
| State of Wisconsin | Executive Order #90 (September 22, 2020), Executive Order #95 (November 20, 2020) – Successive Emergency Declarations and Renewed Face Covering Mandates | Extended the statewide public health emergency and face covering mandates through successive 60-day declarations. |
| State of Wisconsin (DHS) | Emergency Order #3 – Limiting Public Gatherings (issued October 6, 2020; effective October 8, 2020; expired November 6, 2020). Issued under authority of Wis. Stat. § 252.02(3) | Limited all indoor public gatherings to no more than 25% of the established occupancy limit for any room or building open to the public. Applied to all businesses accessible to the public, including retail stores, restaurants, and office lobbies. Spaces without an occupancy limit were limited to 10 persons. Enforceable by civil forfeiture under Wis. Stat. § 252.25.<br><br>The order compelled businesses to restructure physical layouts, reduce capacity, and implement occupancy monitoring systems. |
| State of Wisconsin | Executive Order #104 – Declaring a State of Emergency and Public Health Emergency (January 19, 2021); revoked by 2021 Senate Joint Resolution 3 on February 4, 2021 | Declared a new state of emergency and public health emergency under Wisconsin law, triggering emergency powers and related executive actions. |
| State of Wisconsin | Emergency Order #1 – Face Coverings (issued January 19, 2021, pursuant to Executive Order #104); | Required all individuals aged 5 and older to wear face coverings in all indoor public spaces and enclosed spaces when another person not part of the individual's household |

| | | |
|---|---|---|
| | superseded by new emergency order on February 4, 2021 | was present. Enforceable by civil forfeiture of up to $200.<br>Caused work disruptions and reduced service capacity. |
| State of Wisconsin | Executive Order #105 – Declaring a State of Emergency and Public Health Emergency (February 4, 2021); renewed Emergency Order #1 – Face Coverings (February 4, 2021) | Governor Evers issued EO #105 declaring a new public health emergency and a renewed Emergency Order #1 requiring face coverings statewide. |
| State of Wisconsin (Statutory Authority) | Wis. Stat. § 252.02 – Department of Health Services Powers to Control Communicable Diseases (permanent statute; authority independent of any emergency declaration under Wis. Stat. § 323.10) | Granted DHS broad, standing authority to “authorize and implement all emergency measures necessary to control communicable diseases” (§ 252.02(6)) and to close establishments (§ 252.02(3)).<br><br>This permanent statutory authority provided continuing legal basis for DHS measures to control communicable diseases and restrict gatherings. |
| State of Wisconsin (DHS/DSPS) | Emergency Order #16 – Department of Safety and Professional Services Credentialing (March 27, 2020), Emergency Order #20 (April 3, 2020) – DSPS credentialing of health care providers; Emergency Order #21 (April 3, 2020) – DHS administrative rule suspensions for EMS, nursing homes, hospices, and home health agencies. | These orders affected healthcare suppliers’ operations and staffing models, thereby impacting the volume and continuity of revenue cycle data flowing to Plaintiffs. |
| Federal – OSHA (Mandatory Standard) | OSHA COVID-19 Healthcare; Emergency Temporary Standard (29 C.F.R. Part 1910, Subpart U, § 1910.502) (effective June 21, 2021) | Imposed a binding emergency temporary standard requiring healthcare employers to implement comprehensive COVID-19 protocols, including patient screening and triage, transmission-based precautions, mandatory masking or respirators, physical distancing, physical barriers, enhanced cleaning and disinfection, ventilation |

| | | |
|---|---|---|
| | | controls, employee health screening, training, and detailed recordkeeping/reporting.<br><br>These OSHA guidelines were adopted and enforced in many states in which Plaintiffs operate (including enforcements in Wisconsin), which the IRS has agreed causes these rules to constitute applicable orders for ERC purposes. |
| Federal – CMS (Mandatory Standard) | Interim Final Rule (CMS-3414-IFC) – The CMS Long-Term Care Rule Window; COVID-19 Vaccine Immunization Requirements for Residents and Staff (published May 11, 2021; mandatory reporting began June 13, 2021; terminated May 11, 2023, with the end of the federal COVID-19 Public Health Emergency) | Required long-term care (LTC) facilities and ICF-IID providers to implement extensive weekly reporting through the CDC's NHSN system, including COVID-19 vaccination status of residents and staff, doses administered, adverse events, and therapeutics data, with noncompliance triggering escalating financial penalties. |
| Federal – Congress (Mandatory Statute) | American Rescue Plan Act of 2021, Pub. L. 117-2 | Imposed multiple mandatory federal requirements on healthcare providers, including:<br><br>• <u>COBRA Premium Assistance (§9501)</u><br><br>Required full subsidization of COBRA coverage with retroactive eligibility determinations, necessitating extensive historical data reviews, manual account identification, removal from automated collections workflows, and suspension or modification of normal collection activities.<br><br>• <u>Medicaid Coverage Mandate (§9811) and CHIP (§9821)</u> |

| | | |
|---|---|---|
| | | Required immediate coverage of COVID-19 vaccines, administration, and treatment with no cost sharing, coupled with real-time tracking, reporting, and system integration requirements tied to federal funding.<br><br>• ARPA mandates required healthcare suppliers to rapidly reallocate internal IT infrastructure and administrative resources to compliance, disrupting normal billing workflows and reducing data and revenue flow to Plaintiffs. For example, healthcare system clients (the "supplier" of accounts receivable and billing work) were required to reprogram billing systems, conduct manual account audits, and alter or suspend standard collections processes to comply with COBRA premium subsidy requirements and expanded Medicaid and CHIP coverage. As a result, revenue cycle workflows for affected account categories were disrupted, delayed, or temporarily suspended, reducing the volume and continuity of billing data and revenue flows to Plaintiffs. |
| State of Wisconsin (DHS) | Emergency Order #1_(March 13, 2020) – Statewide school closure; Emergency Order #4 (March 16, 2020) – Ban on gatherings of 50+ people; Emergency Order #5 (March 17, 2020) – Ban on gatherings of 10+ people and bar/restaurant closures; Emergency Order #8 (March 20, 2020) – Updated mass gathering ban. | Prohibited mass gatherings, closed schools, and closed bars/restaurants except for takeout/delivery, effective March 17–18, 2020. Superseded by EMO #12 (Safer at Home).<br><br>These orders established the initial operational restrictions that affected healthcare clients' patient volumes and in-person operations, reducing billing workflow to Plaintiffs. |

60. Even though some of the above-listed statutes or orders were lifted or terminated during or prior to the periods in question, they had a lingering effect, and Plaintiffs continued to suffer Suspensions during the periods in question due to those statutes or orders.

61. As stated earlier, however, Plaintiffs are licensed and operate in all 50 states. As a result, states other than Wisconsin issued statutes and orders that affected Plaintiffs.

62. Plaintiffs are healthcare collection and revenue cycle management companies. Many states imposed severe restrictions on activities of companies like Plaintiffs.

63. For example:

i. Section 207 of the Washington D.C. Emergency Act amended D.C. Code § 28-3814 to add a number of restrictions related to the collection of debt during the pandemic;

ii. Massachusetts adopted sweeping prohibitions on debt collection practices during COVID (see 940 CMR 35:00);

iii. Nevada closed all Nevada collection agencies and mandated out-of-state collection agencies to cease collection efforts dealing with Nevada residents;

iv. Louisiana effectively banned the use of phone calls to collect debt (see LPSC General Order R-29617); and

v. North Carolina ordered all collection agencies to allow consumers certain payment deferrals (in order to comply with North Carolina General Statute 58-2-46, NC's State of Disaster statute).

64. Some states imposed bans on medical procedures and visits that resulted in a reduction in revenue for both the medical providers and Plaintiffs.

65. Physician offices in many states were subject to strict operational mandates, licensure adjustments, mandated closures for non-urgent care, and limitations on patient visits.

66. Some states adopted, as state law, and enforced federal OSHA rules.

67. Michigan, for example, incorporated the OSHA General Duty Clause into its MIOSHA General Duty Clause, which Michigan used to investigate and fine many businesses for not complying with COVID standards.

68. Although Plaintiffs are headquartered in Marshfield, Wisconsin, they also operate in Dane County and Milwaukee County, Wisconsin's most populous counties.

69. Those two counties issued orders mandating: (i) hygiene and cleaning policies, (ii) reduced office presence, (iii) remote work, and (iv) other operational restrictions. These orders caused reduced capacity for Plaintiffs' clients and reduced business for Plaintiffs.

70. The panoply of orders coming from virtually every state and many municipalities combined to deaden Plaintiffs' historical business activities.

71. Despite having to continue to rent their office spaces, Plaintiffs were forced to transition from in-office operations to remote operations, which increased their expenses and decreased their capacity and net revenue.

72. Plaintiffs had to scramble to equip their remote workers with laptops, printers, copiers, scanners and other equipment to use at their homes, thus increasing their expenses and reducing their net profit.

73. Worker productivity suffered, in part because home offices were inadequate and in part because Plaintiffs lost the ability to continuously monitor their workers.

74. IT and security costs increased dramatically because of the switch to remote work.

75. Plaintiffs' net profits never fully recovered and are still well below what they would have been absent the COVID-era regulations.

**<u>Count I — Claim for Refund of Taxes-Alliance</u>**

76. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

77. For the quarters in question, Alliance timely filed claims for refund due to Employee Retention Credits in the following amounts:

| Quarter | Amount of Claim |
|---|---|
| 1st Quarter | $405,978.23 |
| 2nd Quarter | $312,188.24 |
| 3rd Quarter | $409,506.43 |

78. Alliance timely paid all employment taxes reported as paid on its claims for refund for the first, second and third quarters of 2021.

79. Alliance timely filed this suit for refund for its first, second and third quarter overpayments of employment taxes.

80. Alliance is entitled to employment tax refunds from Defendant for the quarters in question in the following amounts:

| Quarter | Amount of Refund Due **Alliance** |
|---|---|
| 1st Quarter | $405,978.23 |
| 2nd Quarter | $312,188.24 |
| 3rd Quarter | $409,506.43 |

**Count II — Claim for Refund of Taxes—HBS**

81. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

82. For the third quarter of 2021, HBS timely filed a claim for refund due to Employee Retention Credits in the amount of $209,632.92.

83. HBS timely paid all employment taxes reported as paid on its claim for refund for the third quarter of 2021.

84. HBS timely filed this suit for refund for its third quarter of 2021 overpayment of employment taxes.

85. HBS is entitled to an employment tax refund from Defendant for the third quarter of 2021 in the amount of $209,632.92.

**Count III — Claim for Interest—Both Alliance and HBS**

86. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

87. Pursuant to I.R.C. § 6611, Plaintiffs are entitled to compound interest, at the overpayment rate established under IRC Section 6621, on the unpaid amount of any tax refund that is due to Plaintiffs.

88. As of the date of this filing, Plaintiffs have not received any part of the refunds (or interest on the refunds) that are due Plaintiffs, as outlined in Counts I and II.

89. Accordingly, Plaintiffs are entitled to interest, under IRC § 6611, on the unpaid amount of the refunds of tax and interest that are due to Plaintiffs until Defendant pays all of such refunds and corresponding interest.

**Count IV — Claim for Attorneys' Fees—Both Alliance and HBS**

90. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

91. Alliance timely filed a claim for refund (Form 941-X) for the first quarter of 2021.

92. Alliance timely filed a claim for refund (Form 941-X) for the second quarter of 2021.

93. Alliance timely filed a claim for refund (Form 941-X) for the third quarter of 2021.

94. HBS timely filed a claim for refund (Form 941-X) for the third quarter of 2021.

95. In a Letter 105C dated August 19, 2024, Defendant disallowed Alliance's claim for refund for the first quarter of 2021.

96. In a Letter 105C dated April 10, 2026, Defendant disallowed Alliance's claim for refund for the second quarter of 2021.

97. In a Letter 105C dated October 17, 2024, Defendant disallowed Alliance's claim for refund for the third quarter of 2021.

98. In a Letter 105C dated December 10, 2024, Defendant disallowed HBS's claim for refund for the third quarter of 2021.

99. In each Letter 105C, Defendant explained that Plaintiffs were entitled to IRS Appeals Office consideration of the disallowances of Plaintiffs' claims for refund.

100. Plaintiffs timely filed requests for IRS Appeals Office consideration of each disallowance of their claims for refund.

101. The IRS granted an Appeals Conference for Alliance's claim for refund for the first quarter of 2021.

102. The IRS did not grant an Appeals Conference with respect to Alliance's or HBS's other claims for refund that are at issue here, and the IRS recently indicated that it could not locate Alliance's request for Appeals consideration for the second or third quarters.

103. As a result, the IRS would not consider signing a Form 907 for either of those quarters and stipulating to the extension of the two-year limitations period for filing a suit for refund.

104. This case involves, among other things, a mechanical application of the Gross Receipts Test and should have been resolved administratively in the IRS.

105. Due to the IRS's negligence and unreasonableness, however, it was necessary to file this suit.

106. Plaintiffs properly exhausted all administrative remedies, but this litigation resulted because of the IRS's mishandling of the administrative process, loss of requests for Appeals conferences, and failure to grant Appeals conferences.

107. Pursuant to I.R.C. § 7430, if either Plaintiff prevails, that Plaintiff may recover from Defendant reasonable litigation and administrative attorneys' fees and costs.

108. Accordingly, Plaintiffs request an award of costs and attorneys' fees incurred as a result of the IRS's actions and omissions in this matter, including, but not limited to, all costs and attorneys' fees awardable under IRC § 7430.

## Prayer for Relief

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(A) Enter judgment for Alliance in the amount of $1,127,672.90;

(B) Enter judgment for HBS in the amount of $209,632.92;

(C) Enter judgment for each Plaintiff for interest on such amounts as are owed to them, including, but not limited to, all interest due under IRC §6611;

(D) Enter judgment for each Plaintiff for reasonable attorneys' fees and costs, including, but not limited to, all litigation and administrative fees and costs awardable under IRC § 7430; and

(E) Award to each Plaintiff all other relief to which such Plaintiff is entitled at law or in equity.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and 28 U.S.C. § 2402, Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

MILLER JOHNSON
*Attorneys for Plaintiffs*

Dated: October 8, 2026

By: /s/ D. Andrew Portinga

D. Andrew Portinga (P55804)
Bryce C. Akins (P88780)
Amanda L. Rauh-Bieri (P83615)
Business Address:
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
Telephone: (616) 831-1700
portingaa@millerjohnson.com
akinsb@millerjohnson.com
rauhbieria@millerjohnson.com